UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PLANET BINGO, LLC,

              Plaintiff,

                                       File No. 1:12-CV-219

v.

                                       HON. ROBERT HOLMES BELL

VKGS, LLC,

              Defendant.

_____/

## O P I N I O N

On March 7, 2012, Planet Bingo, LLC sued VKGS, LLC (d/b/a Video King) for patent infringement. (Dkt. No. 1.) On October 19, 2012, following extensive briefing and a hearing, this Court denied, without prejudice, Video King's motion for summary judgment, which argued that Planet Bingo's patents are invalid under 35 U.S.C. § 101 for failure to recite patentable subject matter. (Dkt. No. 34.) In denying this motion without prejudice, the Court instructed the parties that the motion could be renewed following claim construction. A *Markman* hearing was held on April 18, 2013, and the Court issued an opinion and order construing the disputed terms in Patent Nos. 6,398,646 (the '646 Patent) and 6,656,045 (the '045 Patent) on April 22, 2013. (Dkt. Nos. 58-60.) This matter is before the Court on Video King's renewed motion for summary judgment on account of invalidity. (Dkt. No. 66.)

### I.

The '646 patent is directed at a computer-aided method and system for managing a

Bingo game while allowing a repeat player to play the same sets of numbers in multiple games of Bingo.  (Dkt. No. 1, Ex. A, '646 Patent, Abstract.)  Essentially, the system allows (1) players to select their own numbers and store them for later use, (2) players to print off game tickets at the Bingo playing site with those pre-selected numbers, and (3) Bingo hall operators to track and validate these sets of numbers.  (*Id.*)  The '045 Patent is similar.  It is directed to an automated method and system for storing preselected Bingo numbers, which allows players to play the same sets of Bingo numbers in multiple sessions.  (Dkt. No. 1, Ex. B, '045 Patent, Abstract.)  Players can pay to purchase the sets of Bingo numbers and also input them into the computer to verify a winning set of Bingo numbers.  (*Id.*)

Video King moved for summary judgment on account of non-patentable subject matter on August 31, 2012.  (Dkt. No. 21.)  In denying this motion without prejudice the Court noted that, although Video King presented a "strong case" for invalidity, the abstractness of the subject matter of the patents was not certain and claim construction would be helpful before making a final determination on invalidity.  (Dkt. No. 34, at 4-5.)  Consequently, the Court reviewed extensive briefing on claim construction and held a *Markman* hearing.  Following this hearing, the Court issued an opinion and order declining to construe terms entitled to their ordinary meaning, construing terms not commonly used or ambiguous as written, and invalidating Claims 26-27 of the '646 Patent and Claims 15-16 of the '045 Patent as indefinite under 35 U.S.C. § 112(b).  (Dkt. Nos. 59-60.)

## II.

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)).  Nevertheless, the mere existence of a scintilla of evidence in support of a non-movant's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

All issued patents are presumed valid, 35 U.S.C. § 282, a presumption which applies to all challenges to patentability, including those under § 101. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1284 (Fed. Cir. 2013) (en banc) (Lourie, C.J., concurring).

The scope of patentable subject matter is defined as "any new and useful process,

3

machine, manufacture, or composition of matter, or any new and useful improvement thereof . . . ." 35 U.S.C. § 101. "The Court has long held that this provision contains an important implicit exception. '[L]aws of nature, natural phenomena, and abstract ideas' are not patentable." *Mayo Collaborative Serv. v. Prometheus Lab., Inc.*, 132 S. Ct. 1289, 1293 (2012) (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). "[M]ethods which can be performed mentally, or which are the equivalent of human mental work, are unpatentable abstract ideas." *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011).

### III.

The parties dispute the appropriate legal test to use for determining whether a computer-aided invention is abstract. This dispute is mostly the product of the Federal Circuit's own confusion on the matter. *See CLS Bank*, 717 F.3d at 1276 (Lourie, C.J., concurring) ("Short and unadorned, § 101 appears deceptively simple on its face, yet its proper application to computer-implemented inventions and in various other fields of technology has long vexed this and other courts."). *CLS Bank*, the Federal Circuit's most recent en banc opinion regarding patentable subject matter, resulted in a brief per curiam judgment that stated the court's holding but no reasoning. *Id.* at 1273. This holding was supplemented by five additional, conflicting opinions, none of which garnered a majority, and a "reflection." (*See id.* at 1292 n.1 (Rader, C.J. concurring in part and dissenting in part).) Not only does this fractured opinion evidence the fact that the circuit judges disagree

4

about which legal test to use to determine abstractness, but also that even those circuit judges who do agree on which test to use cannot agree on the application of that test.

Ignoring the question of application for the moment, in *CLS Bank* the judges were mainly split between two approaches to abstractness under § 101.[1]

First, the plurality opinion authored by Circuit Judge Lourie, and representing five members of the ten judge en banc panel, advances an "Integrated Approach" which combines basic principles espoused in previous Supreme Court § 101 decisions[2] to come up with a comprehensive test:

> The first question is whether the claimed invention fits within one of the four statutory classes set out in § 101. Assuming that condition is met, the analysis turns to the judicial exceptions to subject-matter eligibility. . . .
>
> Where bona fide § 101 concerns arise, however, it is important at the outset to identify and define whatever fundamental concept appears wrapped up in the claim so that the subsequent analytical steps can proceed on a consistent footing. . . .
>
> The § 101 inquiry next proceeds to the requisite preemption analysis. With the pertinent abstract idea identified, the balance of the claim can be evaluated to determine whether it contains additional substantive limitations that narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself.
>
> The requirement for substantive claim limitations beyond the mere recitation of a disembodied fundamental concept has "sometimes" been referred to as an "inventive concept." . . . An "inventive concept" in the § 101 context refers to

---

[1]Circuit Judge Newman offered her own third approach, which appears to argue that there should be no abstract idea exception to patentable subject matter. 717 F.3d at 1321.

[2]*Mayo*, 132 S. Ct. 1289; *Bilski v. Kappos*, 130 S. Ct. 3218 (2010); *Diehr*, 450 U.S. 175; *Parker v. Flook*, 437 U.S. 584 (1978); *Gottschalk v. Benson*, 409 U.S. 63 (1972).

a genuine human contribution to the claimed subject matter.  Accordingly, an "inventive concept" under § 101—in contrast to whatever fundamental concept is also represented in the claim—must be "a product of human ingenuity."

In addition, that human contribution must represent more than a trivial appendix to the underlying abstract idea.  Limitations that represent a human contribution but are merely tangential, routine, well-understood, or conventional, or in practice fail to narrow the claim relative to the fundamental principle therein, cannot confer patent eligibility.

*CLS Bank*, 717 F.3d at 1282-84 (Lourie, C.J. concurring) (internal citations omitted).

Chief Judge Rader, and a total of four of the en banc judges, also relying on Supreme Court precedent, advocate a contrary approach, which the Court will call the "Meaningful Limitations Approach":

The relevant inquiry must be whether a claim includes meaningful limitations restricting it to an application, rather than merely an abstract idea. . . . A claim may be premised on an abstract idea—the question for patent eligibility is whether the claim contains limitations that meaningfully tie that idea to a concrete reality or actual application of that idea."

First, we know a claim is not meaningfully limited if it merely describes an abstract idea or simply adds "apply it." . . . We also know that, if a claim covers all practical applications of an abstract idea, it is not meaningfully limited. . . . It is not the breadth or narrowness of the abstract idea that is relevant, but whether the claim covers every practical application of that abstract idea.

And, we know that, even if a claim does not wholly pre-empt an abstract idea, it still will not be limited meaningfully if it contains only insignificant or token pre- or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment.

Finally, the Supreme Court has told us that a claim is not meaningfully limited if its purported limitations provide no real direction, cover all possible ways to achieve the provided result, or are overly-generalized.

6

. . . Thus, a claim is meaningfully limited if it requires a particular machine implementing a process or a particular transformation of matter. . . . A claim also will be limited meaningfully when, in addition to the abstract idea, the claim recites added limitations which are essential to the invention.

When assessing computer implemented claims, while the mere reference to a general purpose computer will not save a method claim from being deemed too abstract to be patent eligible, the fact that a claim is limited by a tie to a computer is an important indication of patent eligibility. This is true both because its tie to a machine moves it farther away from a claim to no more than an idea and because that same tie makes it less likely that the claims will pre-empt all practical applications of the idea.

The key to this inquiry is whether the claims tie the otherwise abstract idea to a specific way of doing something with a computer, or a specific computer for doing something; if so, they likely will be patent eligible, unlike claims directed to nothing more than the idea of doing that thing on a computer. While no particular type of limitation is necessary, meaningful limitations may include the computer being part of the solution, being integral to the performance of the method, or containing an improvement in computer technology.

*Id.* at 1299-1302 (Rader, C.J., concurring in part and dissenting in part) (internal citations omitted).

As a result of the Federal Circuit's present fractured state, this Court is left in a quandary. As Circuit Judge Newman aptly noted in her *CLS Bank* opinion, as a result of the split en banc decision, "the only assurance" is that, unless the Supreme Court takes up the issue again, the patent eligibility of any invention challenged on abstractness grounds "will depend on the random selection of the [Federal Circuit] panel." *CLS Bank*, 717 F.3d at 1321. Nevertheless, despite the seeming futility of adopting one of the non-precedential approaches from *CLS Bank*, the Court will endeavor to follow the law as it sees it.

7

In this Court's opinion, the approach proffered by Circuit Judge Lourie accurately reflects the current state of Supreme Court jurisprudence. A large source of the divide in *CLS Bank* (ignoring for a moment the fundamental policy differences between the Lourie and Rader camps) centers on what the Supreme Court meant by the phrase "inventive concept" in *Mayo*. *See Mayo*, 132 S. Ct. at 1294 ("[Supreme Court precedents] insist that a process that focuses upon the use of a natural law also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself."). Chief Judge Rader contends that the plurality's interpretation of "inventive concept" as "a product of human ingenuity" results in "stripping away all known elements from the asserted system claims and analyzing only whether what remains, as opposed to the claim as a whole, is an abstract idea." 717 F.3d at 1315.[3] It is well-established that claims must be considered as a whole when assessing patent eligibility. *See Diehr*, 450 U.S. at 188.

However, the Court finds Chief Judge Rader's concern to be overstated. Circuit Judge Lourie specifies that under his interpretation of "inventive concept," claims are evaluated as a whole for whether they result in a product of human ingenuity. First, he cites *Mayo* for the proposition that "we must look for meaningful limitations that prevent **the claim as a whole** from covering the concept's every practical application." 717 F.3d at 1281 (emphasis

---

[3]*See also CLS Bank*, 717 F.3d at 1314 (Moore, C.J., dissenting in part) (alleging that Circuit Judge Lourie's interpretation of inventive concept "trample[s] upon a mountain of precedent that requires us to evaluate each claim as a whole when analyzing validity").

8

added).    Second, following multiple citations to *Mayo* to justify his interpretation of "inventive concept," Circuit Judge Lourie explains the practical effect of applying his interpretation:  "Analyzing patent eligibility . . . considers whether **steps combined with a natural law or abstract idea** are so insignificant, conventional, or routine as to yield a claim that effectively covers the natural law or abstract idea itself."  *Id.* at 1284 (emphasis added).

Moreover, the Court finds that Chief Judge Rader's preferred interpretation of "inventive concept" is inconsistent with *Mayo*.  From his opinion, it appears that Chief Judge Rader interprets "inventive concept" to mean that any system claim which contains structural limitations satisfies the inventive concept requirement:

> [A] system claim's structural limitations restrict the claimed machine by requiring certain physical components. These concrete elements are precisely the sort of "inventive concept" that meaningfully limits the claim, preventing it from "tying up" the underlying abstract idea itself. Although the individual components themselves may not be new or innovative, the particular combination of components recited in the claim results in a brand new machine—a special purpose computer.

*Id.* at 1316.  This is basically a rewording of the "machine" alternative of the machine or transformation test for patentable subject matter, a test which Chief Judge Rader cites approvingly earlier in his opinion.  *See id.* at 1302 ("[A] claim is meaningfully limited if it requires a particular machine implementing a process or a particular transformation of matter.").  However, in *Mayo*, the Supreme Court emphasized *Bilski*'s holding that the machine or transformation test, while a "useful and important clue," "is not a definitive test of patent eligibility."  *Mayo*, 132 S. Ct. at 1296 (citing *Bilski*, 130 S. Ct. at 3227).  This

holding not only means that the machine or transformation test is non-exclusive, but it also means, as evidenced by *Mayo*'s further analysis, that the test is not dispositive of patent eligibility even if satisfied.  After all, *Mayo*, in finding that not all transformations are relevant to the abstractness inquiry, noted that the Supreme Court has never held that the machine or transformation test trumps the exclusions to patentable subject matter.  *Id.* at 1303.

Consequently, the Court believes that Chief Judge Rader's reasoning oversimplifies the meaning of "inventive concept."  While it is surely true that sometimes the addition of a physical component to an abstract idea or the use of a particular machine can result in a non-abstract invention, this is not always the case.  This is precisely why *Mayo* required there to be an "inventive" concept as opposed to a "physical" or "transformative" concept.  132 S. Ct. at 1294; *see also Bilski*, 130 S. Ct. at 3230 (quoting *Diehr*, 101 S. Ct. at 1048) ("[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.' "); *Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[T]he use of a computer in an otherwise patent-ineligible process for no more than its most basic function—making calculations or computations—fails to circumvent the prohibition against patenting abstract ideas and mental processes.").

The Court will accordingly apply Circuit Judge Lourie's approach, which garnered

the most votes in *CLS Bank* and most adequately represents the current law on patentable

subject matter.[4]  Before analyzing the claims in this case under this approach, a brief word

must be said on the approach advocated by Planet Bingo.  Planet Bingo argues for a

"manifest abstractness" test:

> Defendant fundamentally errs in failing to apply the guidance set forth by
> recent Federal Circuit precedent on abstractness, viz., whether the abstractness
> of the claims in question, i.e., its "disqualifying characteristic," ***"should
> exhibit itself so manifestly*** as to override the broad statutory categories of
> eligible subject matter and the statutory context that directs primary attention
> to the patentability criteria (i.e., §§ 102, 103, and 112) of the rest of the Patent
> Act."

(Dkt. No. 67, Resp. at 15 (quoting *Big Baboon, Inc. v. Dell, Inc.*, CV 09-1198 SVW (SSx),

2011 U.S. Dist. LEXIS 155536, at *39 (C.D. Cal. Feb. 8, 2011)).  In support of this

"manifest abstractness" approach, Planet Bingo cites to *Research Corp. Technologies, Inc.*

*v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010), and *Dealertrack, Inc. v. Huber*, 674 F.3d

1315 (Fed. Cir. 2012).  However, Planet Bingo is merely "cherry-picking" a phrase that

---

[4]Circuit Judge Moore's admonishment that Circuit Judge Lourie's approach will lead to
"the death of hundreds of thousands of patents, including all business method, financial system,
and software patents as well as many computer implemented and telecommunications patents,"
717 F.3d at 1313, is overstated.  First, this approach does not require the invalidation of "all"
such patents.  Aspects of human ingenuity exist in many of these patents.  Second, for the patents
for which the approach would require invalidation, there is nothing inherently wrong with
invalidating current patents which cover unpatentable subject matter and should not have been
issued in the first place.  Indeed, much has been written about the need to use § 101 to reign in
the broad number of software patents currently being issued.  *See, e.g.*, Maayan Perel, *Reviving
the Gatekeeping Function: Optimizing the Exclusion Potential of Subject Matter Eligibility*, 23
Alb. L. J. Sci. & Tech. 237 (2013); David S. Olson, *Taking the Utilitarian Basis for Patent Law
Seriously: the Case for Restricting Patentable Subject Matter*, 82 Temple L. Rev. 181 (2009);
James Bessen & Michael J. Meurer, *Patent Failure: How Judges, Bureaucrats, and Lawyers Put
innovators at Risk* (2008); Jay Dzratler, Jr., *Does Lord Darcy Yet Live? The Case Against
Software and Business-Method Patents*, 43 Santa Clara L. Rev. 823 (2003).

appears in these two decisions.  There is no "manifest abstractness" test in Federal Circuit jurisprudence.  The reference to "manifestly" first appeared in *Research Corp.* as part of an effort to define what "abstract" means.  *See Research Corp.*, 627 F.3d at 868 ("[T]his court also will not presume to define "abstract" beyond the recognition that this disqualifying characteristic should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act.").[5]  The term "manifest" does not appear in any of the opinions in *CLS Bank* and will not be considered part of the abstractness approach by this Court either.

## IV.

In *CLS Bank*, eight judges agreed that the same analysis should apply to both the system and method claims at issue.  The five judges represented by Circuit Judge Lourie argued that system and method claims should always receive such equal treatment:

> As illustrated by the obvious parallels between the method and system claims now before us, it is often a straightforward exercise to translate a method claim into system form, and vice versa. That much has long been recognized. Thus, when § 101 issues arise, the same analysis should apply regardless of claim format: Does the claim, in practical effect, place an abstract idea at risk of preemption? And, if so, do the limitations of the claim, including any computer-based limitations, add "enough" beyond the abstract idea itself to

---

[5]Moreover, the Court pays no credence to this "definition" of abstractness.  The "definition" quoted from *Research Corp.* is not really a definition; one cannot define a quality by how apparent or obvious that very same quality is.  How manifest an abstractness is, is a question of degree.  It has long been the law that "abstract ideas" are not patentable.  *See Mayo*, 132 S. Ct. at 1293.  The Supreme Court has never qualified this exception by providing that abstract ideas that are not exhibited manifestly may be patented.

limit the claim to a narrower, patent-eligible application of that idea? Or, is it merely a Trojan horse designed to enable abstract claims to slide through the screen of patent eligibility?

717 F.3d at 1289-90 (internal citations omitted). Circuit Judges Linn and O'Malley, while agreeing that equal treatment in *CLS Bank* was appropriate, argued that system and method claims should only receive the same analysis when "they all contain the same computer based limitations." *Id.* at 1332. Circuit Judge Newman shared the view that the *CLS Bank* claims should stand or fall together but did not expound on her reasoning. *Id.* at 1327. In any case, the system and method claims in this case all contain the same computer based limitations and thus will be treated the same, as discussed below.

## A. Independent Method Claims

### 1. Claims

Claims 7, 13, and 19 of the '646 Patent and Claims 5, 17, and 23 of the '045 Patent are independent method claims.

Claim 7 of the '646 Patent reads as follows:

7. A method for playing a game of Bingo which comprises the steps of:

(a) providing a system for managing a game of Bingo which comprises: a computer with a central processing unit (CPU) and with a memory and with a printer connected to the CPU; an input and output terminal connected to the CPU and memory of the computer; and a program in the computer enabling:

(i) input of at least two sets of Bingo numbers which are preselected by a player for repetitive play in games of Bingo over a period of time;

(ii) storage of the sets of Bingo numbers which are preselected

13

by the player as a group in the memory of the computer;

   (iii) assignment of a player identifier unique to the player for the group having the sets of Bingo numbers which are preselected by the player wherein the player identifier is assigned to the group for multiple sessions of Bingo;

   (iv) retrieval of the group using the player identifier;

   (v) selection from the group by the player of at least one of the sets of Bingo numbers preselected by the player and stored in the memory of the computer as the group for play in a selected game of Bingo in a specific session of Bingo wherein a number of sets of Bingo numbers selected for play in the selected game of Bingo is less than a total number of sets of Bingo numbers in the group;

   (vi) addition by the computer of a control number for the set of Bingo numbers which is selected by the player for play in the selected game of Bingo;

   (vii) output of a receipt with the control number, the set of Bingo numbers which is selected for play in the selected game of Bingo, a price for the set of Bingo numbers which is selected for play in the selected game of Bingo, a date of the selected game of Bingo and optionally a computer identification number; and

   (viii) output for verification of a winning set of Bingo numbers by means of the control number which is input into the computer by a manager of the game of Bingo;

   (b) playing the game of Bingo using the set of Bingo numbers wherein the player signals a Bingo to indicate the set of Bingo numbers which is selected for play in the selected game of Bingo is the winning set of Bingo numbers; and

   (c) verifying the winning set of Bingo numbers with the control number with the program.

('646 Patent, Claim 7.)  Claims 13 and 19 of the '646 Patent parallel Claim 7 (albeit not word

14

for word), except they mention the use of a computer in the introduction of the claim and

include four "displaying" steps in place of the output steps appearing in Claim 7(a)(vii-viii):

> 13. A method using a programmable computer having a memory to track a set of Bingo numbers selected by a player to be played in a game of Bingo which comprises the steps of:
>
> . . .
>
> (g) storing the set of Bingo numbers and the control identifier on a computer readable medium;
>
> (h) displaying the set of Bingo numbers to be played in the selected game of Bingo along with the control identifier;
>
> (i) receiving a potentially winning control identifier corresponding to a potentially winning set of Bingo numbers selected by the player after the selected game of Bingo has been played; and
>
> (j) displaying the set of Bingo numbers selected by the player corresponding to the potentially winning control identifier to determine whether the potentially winning set of Bingo numbers is a winning set of Bingo numbers.
>
> . . .
>
> 19. A method using a programmable computer to track a set of Bingo numbers selected by a player to be played in a game of Bingo which comprises the steps of:
>
> . . .
>
> (g) storing the control identifier for the set of Bingo numbers to be played in the game of Bingo on the computer readable medium;
>
> (h) displaying the set of Bingo numbers to be played in the game of Bingo along with the corresponding control identifier;
>
> (i) receiving a potentially winning control identifier corresponding to

a potentially winning set of Bingo numbers after the game of Bingo has been played; and

(j) displaying the set of Bingo numbers corresponding to the potentially winning control identifier to determine whether the potentially winning set of Bingo numbers is a winning set of Bingo numbers.

('646 Patent, Claims 13, 19.)

Claim 5 of the '045 Patent reads as follows:

5. A method for playing a game of Bingo which comprises the steps of:

(a) providing a computer having a central processing unit (CPU) and a memory;

(b) providing an input device connected to the computer;

(c) providing an output device connected to the computer;

(d) providing a computer program capable of operating on the computer;

(e) inputting at least two sets of Bingo numbers preselected by a player into the computer for repetitive play in games of Bingo over a period of time;

(f) storing the sets of Bingo numbers preselected by the player in the memory of the computer;

(g) assigning a single player identifier unique to the player to the sets of Bingo numbers preselected by the player and stored in the memory of the computer for multiple sessions of Bingo;

(h) retrieving all the sets of Bingo numbers preselected by the player and stored in the memory of the computer using the single player identifier;

(i) selecting at least one set of Bingo numbers preselected by the player and stored in the memory of the computer for play in a selected game of Bingo in a specific session of Bingo;

(j) assigning a separate control number for each set of Bingo numbers selected for play in the selected game of Bingo;

(k) paying an amount necessary to purchase the sets of Bingo numbers selected for play in the selected game of Bingo in the specific session of Bingo to enable the player to play the sets of Bingo numbers selected for play in the selected game of Bingo in the specific session of Bingo;

(l) outputting a receipt having the sets of Bingo numbers selected for play in the selected game of Bingo and the control numbers;

(m) playing the game of Bingo using the sets of Bingo numbers selected for play in the selected game of Bingo wherein the player signals a Bingo to indicate one of the sets of Bingo numbers is a winning set of Bingo numbers; and

(n) verifying the winning set of Bingo numbers.

('045 Patent, Claim 5.) Claim 17 mirrors Claim 5, except it excludes the "for repetitive play . . . over a period of time" limitation which appears in Claim 5(e). Additionally, Claim 17(i) adds the phrase "and less than all the sets of Bingo numbers" immediately following "selecting at least one set of Bingo numbers." Last, Claim 17 lacks the "assigning a separate control number" and "paying" steps which appears in Claim 5(j),(k). Claim 23 of the '045 Patent is substantially similar to Claim 5 except it includes the use of a computer in the introduction of the claim and includes four "displaying" steps in place of the output steps appearing in Claim 5(k)-(n):

23. A method using a programmable computer having a memory to track a set of Bingo numbers selected by a player to be played in a selected game of Bingo which comprises the steps of:

. . .

17

(g) storing each set of Bingo numbers selected by the player to be played in the selected game of Bingo along with its assigned control identifier;

(h) displaying each set of Bingo numbers to be played in the selected game of Bingo along with its assigned control identifier;

(i) receiving a potentially winning control identifier corresponding to one set of Bingo numbers selected by the player to be played in the selected game of Bingo after the selected game of Bingo has been played wherein the set of Bingo numbers is a potentially winning set of Bingo numbers; and

(j) verifying that the set of Bingo numbers selected by the player corresponding to the potentially winning control identifier is a winning set of Bingo numbers.

('045 Patent, Claim 23.)

## 2. Application of Integrated Approach

In somewhat simplified layman's terms, all of the method claims recite a computer-aided method for playing the game of Bingo which allows for the storage of a player's preferred sets of Bingo numbers, the retrieval of one such set upon demand, and the playing of such a set, while simultaneously allowing a Bingo operator to track these sets and verify winning numbers. The differences between the iterations, besides minor wording and structural divergences, are in display capabilities and in the option to purchase sets of Bingo numbers.

Because these method claims plainly recite processes, they are within the statutory classes laid out by § 101. Thus, as the Integrated Approach instructs, "[t]he issue presented then becomes whether that process amounts to no more than a patent-ineligible abstract idea." 717 F.3d at 1285-86. First, the Court must identify the abstract idea represented in

18

the claim.  Plainly, each method claim encompasses the abstract idea of managing/playing the game of Bingo.  Managing and/or playing the game of Bingo, of course, consists solely of mental steps which can be carried out by a human using pen and paper, and on its own is not patentable.  *See Cybersource*, 654 F.3d at 1371 ("[M]ethods which can be performed mentally, or which are the equivalent of human mental work, are unpatentable abstract ideas.").

The Integrated Approach next requires, as a preemption analysis, a determination as to whether additional substantive limitations are included on the managing and/or playing of the game of Bingo in each claim so that each claim does not cover the full abstract idea itself.  These substantive limitations must represent a human contribution that is more than "tangential, routine, well-understood, or conventional."  *CLS Bank*, 717 F.3d at 1283 (Lourie, C.J., concurring).  Instead, the human contribution (i.e., *Mayo*'s "inventive concept"), when considering the claim as a whole, must be "a product of human ingenuity."  *Id.*  The use of a computer as an essential limitation in a claim covering an abstract process does not necessarily make the claim non-abstract.  *See Cybersource*, 654 F.3d at 1375 ("[T]he incidental use of a computer to perform the mental process [of the claim] does not impose a sufficiently meaningful limit on the claim's scope. . . . [T]he basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium.").

19

Taken as a whole, the limitations in the method claims cannot be said to result in a product of human ingenuity.  First, the limitations provide only for the use of a computer performing its most basic functions: storing numbers, assigning identifiers, allowing for basic inputs and outputs, printing of a receipt, displaying of numbers, and/or matching a player's numbers with the called numbers for verification.  "[T]he use of a computer in an otherwise patent-ineligible process for no more than its most basic function—making calculations or computations—fails to circumvent the prohibition against patenting abstract ideas and mental processes."  *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1277-78 (Fed. Cir. 2012); *see also WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 40 (Fed. Cir. 2012) ("Because the WhitServe patents simply describe a basic and widely-understood concept—that it is useful to provide people with reminders of important due dates and deadlines—and then apply that concept using conventional computer technology and the Internet, they fail to meet section 101's subject matter eligibility requirements.").

Second, the recitation of a computer limitation in these method claims does not change the fact that the steps to be undertaken by a computer program are all steps that can be carried out by a human with pen and paper.  "To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not."  *Bancorp*, 687 F.3d at 1278.  Bingo has been managed and played for decades with humans carrying out all of the

20

steps recited in the claims; to have a computer program carry out these steps via its basic functions is not a product of human ingenuity and does not disguise the fact that an abstract process is claimed. To grant patent protection in such a case would "impede innovation more than it would tend to promote it." *Mayo*, 132 S. Ct. at 1293.

Last, the use of a computer in the method claims adds nothing more than the ability to manage a game of Bingo more efficiently. Planet Bingo argues that its invention has reduced the risk of tampering with "pick-your-own-numbers" Bingo and eliminated long lines to play Bingo. (Dkt. No. 68, Wei Decl. ¶ 10; Dkt. No. 69, Forman Decl. ¶ 7.) However, this argument is basically one of improved efficiency and accuracy, qualities which cannot support a finding that the claimed subject matter is non-abstract. "[A computer] must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010); *see also MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250, 1267 (Fed. Cir. 2012) (Mayer, J., dissenting) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.").

Planet Bingo argues that the Court must take into account the commercial success of the invention for the abstractness analysis, citing *Research Corp.*, which indicated that

"inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." 627 F.3d at 869. However, *Research Corp.* proffered this proposition without citation or support, and the Court cannot find any instance where the Supreme Court has ever indicated that commercial applicability plays a role in determining abstractness. Moreover, the proposition that commercial success may play a role in the abstractness inquiry has subsequently been limited by the Federal Circuit. In *Bancorp*, the Federal Circuit dismissed the proposition that commercial success was applicable to the abstractness inquiry in every case. 687 F.3d at 1279. In finding that commercial applicability was irrelevant to its analysis, *Bancorp* distinguished *Research Corp.* by noting that (1) "the claimed processes in *Research Corp.* plainly represented improvements to computer technologies in the marketplace" and that (2) unlike in *Research Corp.*, "the computer [in the *Bancorp* invention] merely permits one to manage a stable value protected life insurance policy more efficiently than one could mentally." *Id.* The invention in this case contains the same deficiencies highlighted in regard to the *Bancorp* invention. As discussed, Planet Bingo's invention is not a "technological advance." *See id.* Moreover, as in *Bancorp*, the use of a computer in Planet Bingo's invention is "to accelerate an ineligible mental process." *See id.* Consequently, the invention's marketplace applicability in this case does not transform the subject matter of the invention from abstract to non-abstract.

For all of the foregoing reasons, the method claims of the '646 and '045 Patents are

invalid under § 101 for failure to recite patentable subject matter.

**B. Independent System Claims**

  **1. Claims**

    Claim 1 of the '646 Patent and Claims 1 and 10 of the '045 Patent are independent system claims.  Claim 1 of the '646 Patent parallels Claim 7 of the same patent, except Claim 1 covers a "a system for managing a game of Bingo" which comprises the recited steps as opposed to Claim 7 covering "a method for playing a game of Bingo" which comprises those same steps:

    1. A system for managing a game of Bingo which comprises:

      (a) a computer with a central processing unit (CPU) and with a memory and with a printer connected to the CPU;

      (b) an input and output terminal connected to the CPU and memory of the computer; and

      (c) a program in the computer enabling:

        (i) input of at least two sets of Bingo numbers which are preselected by a player to be played in at least one selected game of Bingo in a future period of time;

        (ii) storage of the sets of Bingo numbers which are preselected by the player as a group in the memory of the computer;

        (iii) assignment by the computer of a player identifier unique to the player for the group having the sets of Bingo numbers which are preselected by the player wherein the player identifier is assigned to the group for multiple sessions of Bingo;

        (iv) retrieval of the group using the player identifier;

23

(v) selection from the group by the player of at least one of the sets of Bingo numbers preselected by the player and stored in the memory of the computer as the group for play in a selected game of Bingo in a specific session of Bingo wherein a number of sets of Bingo numbers selected for play in the selected game of Bingo is less than a total number of sets of Bingo numbers in the group;

(vi) addition by the computer of a control number for each set of Bingo numbers selected for play in the selected game of Bingo;

(vii) output of a receipt with the control number, the set of Bingo numbers which is preselected and selected by the player, a price for the set of Bingo numbers which is preselected, a date of the game of Bingo and optionally a computer identification number; and

(viii) output for verification of a winning set of Bingo numbers by means of the control number which is input into the computer by a manager of the game of Bingo.

('646 Patent, Claim 1.)  Claims 1 and 10 of the '045 Patent are substantially similar.  Claim 1 adds an additional step to the computer program of payment by the player to purchase the selected Bingo numbers for play.  ('045 Patent, Claim 1(d)(vii).)  Additionally, Claim 1 allows input of the control number and validation number for verification purposes (whereas Claim 1 of the '646 Patent only allows for "output" of a winning set of Bingo numbers for verification).  ('045 Patent, Claim 1(d)(ix-x).  Claim 10 of the '045 Patent mirrors Claim 1 of the '045 Patent, except it does not allow for payment by the player to purchase the selected Bingo numbers for play and does not allow for input of the validation number for verification purposes (it still allows for input of the control number, however).  ('045 Patent, Claim 10.)

## 2. Application of Integrated Approach

As even a quick examination of the system claims reveals, these claims recite the same

24

basic process as the method claims.  Whereas the method claims cover a "method for playing a game of Bingo" comprising a computer and a computer program carrying out enumerated steps, the system claims cover a "system for managing a game of Bingo" comprising the same computer and computer program carrying out enumerated steps.  (*Compare, e.g.*, '646 Patent, Claim 1 ("A system for managing a game of Bingo which comprises . . . a computer . . .and (c) a program in the computer enabling . . . .") *with* '646 Patent, Claim 7 ("A method for playing a game of Bingo which comprises . . . a computer . . . and a program in the computer enabling . . . .).)  This switch of a simple phrase, to change method claims to system claims which possess virtually the same limitations, demonstrates the truth of Circuit Judge Lourie's observation that "it is often a straightforward exercise to translate a method claim into system form, and vice versa."  717 F.3d at 1289-90.

Here, the limitations of the system claims are the same as the limitations of the method claims that failed to result in an "inventive concept."  Once again, a computer is used only for its most basic functions in each claim: storing numbers, assigning identifiers, allowing for basic inputs and outputs, printing of a receipt, displaying of numbers, and/or matching a player's numbers with the called numbers for verification.  These are the same types of "calculation, storage, and data exchange" computer functions found to not supply meaningful limitations in *CLS Bank*.  *Id.* at 1290.  Accordingly, for the same reasons that the method claims are invalid for reciting unpatentable subject matter, the system claims are invalid under § 101.

25

## C. Dependent Claims

### 1. Claims

The dependent system and method claims can be split into the following categories

based on the new limitation each adds:

### 1. Use of a Second Computer to Enable an Output

| Dependent Claims | Limitation |
|---|---|
| '646 Patent Claims 2, 8; '045 Patent Claims 7, 11, 19, 24 | Use of a second computer system which enables an output of a print of the set of Bingo numbers |
| '045 Patent Claim 2 | Use of a second computer system which enables use of the validation number to receive an output of the set of Bingo numbers selected for play in the selected game of Bingo to be used by the player |

### 2. Manual Inputs

| | |
|---|---|
| '646 Patent Claims 3, 9; '045 Patent Claims 3, 12, 20 | A player inputs a set of preselected Bingo numbers into the computer |
| '646 Patent Claims 4, 10; '045 Patent Claims 13, 21 | An operator of the computer inputs a set of preselected Bingo numbers into the computer |

### 3. Output of Verification Through Printer

| | |
|---|---|
| '646 Patent Claims 6, 12; '045 Patent Claim 14 | The output of the verification of the winning set of Bingo numbers with the control number is printed by the printer |
| '045 Patent Claim 22 | An output of a verification of the winning set of Bingo numbers is printed by a printer |

26

## 4. Printed Receipt: Uses of, Display of

| | |
|---|---|
| '646 Patent Claims 14, 20 | The display of the set of Bingo numbers and the control identifier is a printed receipt and the printed receipt is used to obtain a Bingo card having the set of Bingo numbers selected by the player |
| '646 Patent Claims 15, 21; '045 Patent Claim 25 | The printed receipt has a receipt validation number and the receipt validation number is received by the computer or second computer to obtain the Bingo card having the set of Bingo numbers selected by the player |
| '646 Patent Claim 18; '045 Patent Claim 28 | The display of the set of Bingo numbers and the control identifier is a printed receipt which also includes a date of the game of Bingo, a price for the set of Bingo numbers to be played in a game of Bingo, and a computer identification number |

## 5. Display Additions

| | |
|---|---|
| '646 Patent Claims 5, 11 | The input and output terminal includes a video screen |
| '646 Patent Claims 16, 22; '045 Patent Claims 4, 26 | The display is received by a portable Bingo terminal |

## 6. Verification

| | |
|---|---|
| '646 Patent Claim 17; '045 Patent Claim 27 | After or during the game of Bingo, winning numbers are received and the set of Bingo numbers corresponding to the potentially winning control identifier are compared to the winning numbers to determine whether the winning set of Bingo numbers is a winning set of Bingo numbers |
| '045 Patent Claims 6, 18 | Verification of the winning set of Bingo numbers using the computer program |

27

## 7. Use of Buying Points

| '646 Patent Claim 25; '045 Patent Claims 9, 30 | An accounting of the set of Bingo numbers which is selected by the player for play in the game of Bingo is provided comprising the additional steps of: receiving an amount of buying points corresponding to the player; storing the amount of buying points on the computer readable medium; assigning the player identifier to the buying points wherein one player identifier is assigned to the buying points and the preselected set of Bingo numbers corresponding to one player; retrieving the buying points along with the group having the preselected set of Bingo numbers corresponding to the player; subtracting from the amount of buying points a number of buying points corresponding to each set of Bingo numbers selected by the player to be played in the game of Bingo; displaying a new amount of buying points with the set of Bingo numbers to be played in the game of Bingo in step (h); and replacing the amount of buying points with the new amount of buying points on the computer readable medium |
|---|---|

## 8. Use of Easy Pick Identifier

| '646 Patent Claim 24; '045 Patent Claims 8, 29 | Additional steps are added to the method, consisting of (a) receiving an easy pick identifier and randomly generating a random set of Bingo numbers to be played in the game of Bingo in response to the easy pick identifier, and (b) assigning a control identifier for the random set of Bingo numbers wherein the control identifier for the random set of Bingo numbers is stored with the control identifier for the set of Bingo numbers to be played in the game of Bingo |
|---|---|

## 9. Erasure of Control Identifier

| '646 Patent Claim 23 | When the winning set of Bingo numbers is determined the control identifier for the set of Bingo numbers to be played in the game of Bingo is erased from the computer readable medium |
|---|---|

## 2. Application of Integrated Approach

The limitations provided by the dependent claims are not meaningful. Instead, these limitations are slight variations on the limitations contained in the independent claims. The use of the output function of a second computer, manual inputs, printed outputs, additional display options, and additional verification options utilize the same basic functions of a computer already discussed and still constitute steps that could be performed by a human using pen and paper. Similarly, the addition of "buying points" merely requires another use of the computer's simple storage and calculation abilities, while the inclusion of an "easy pick identifier" relies on the computer's basic input and output functions. Although not previously discussed, the computer's ability to erase memory is similarly a basic function. Consequently, for the same reasons discussed in regard to the independent claims, the dependent claims also recite unpatentable subject matter.

## V.

For the reasons stated above, every remaining claim in the '646 and '045 Patents will be invalidated under § 101 for failure to recite patentable subject matter. Because Planet Bingo cannot maintain its claims for patent infringement with the '646 and '045 Patents invalidated, Video King is entitled to judgment as a matter of law.

An order consistent with this opinion will be entered.


Dated: August 19, 2013                                    /s/ Robert Holmes Bell
                                                          ROBERT HOLMES BELL
                                                          UNITED STATES DISTRICT JUDGE